UNITED STATES *ex rel.* WATTS *v.* JUSTICES OF LAUDERDALE COUNTY.

*(Circuit Court, W. D. Tennessee. January 27, 1882.)*

1. CONTEMPT—MANDAMUS—RESIGNATION OF OFFICERS.
    It is not a contempt of court for an officer to resign to avoid obedience to a writ of *mandamus* where he has an unrestricted right of resignation.

2. SAME—CONSTITUTIONAL LAW—TENNESSEE CONSTITUTION 1870, ART. 7, § 5, CONSTRUED.
    The Tennessee constitution, art. 7, § 5, provides that " every officer shall hold his office until his successor is elected or appointed and qualified." *Held,* that this applies to a resigning officer, who must continue in the discharge of his duties until his successor is elected or appointed and qualified; that the officer remains under an obligation to obey a writ of *mandamus,* notwithstanding his resignation, and is guilty of contempt if he fails to comply with the writ; and the obligation passes to his successor when qualified.

Rule for Contempt.

The relator recovered a judgment in the circuit court of the United States against Lauderdale county for $25,664.32, interest and costs, on bonds and coupons issued by the county in aid of the Memphis, Paducah & Northern Railroad, which judgment was affirmed by the supreme court. The circuit court thereupon issued a peremptory writ of *mandamus* requiring the 26 justices of the peace composing the county court to levy a tax as other taxes were levied, and to collect the same, to pay the judgment. In order to evade obedience to the writ 21 of the justices tendered their resignation to the county

court, which were accepted, leaving the county without a quorum in the court authorized to levy the tax. This was not done until service upon them of the writ of *mandamus*, nor until they had assembled and proposed to the attorney of relator negotiations for a compromise, which ultimately failed. The affidavits disclose a conflict of evidence between the attorney and the justices as to what transpired at the time of the meeting of the justices, they insisting that he waived or excused a levy, and agreed to submit the proposition for compromise to his client, while he insists he did not interfere with the writ, but only agreed to submit a proposition to his client on their undertaking to make a levy either at that term or an adjourned term to be held for the purpose. The court was adjourned to a subsequent day, when the relator's refusal of the compromise was presented, and, being received, the justices resigned in sufficient numbers to leave the court without the number required to make a levy. The sheriff of the county has never held elections to fill the vacancies, as required by law, and the affidavits show a condition of great public hostility to any levy of a tax, and a determination of the people and the officers to do all in their power to escape payment of the bonds, which are claimed to be fraudulent, notwithstanding the decision of the supreme court in favor of their validity.

The relator served this rule upon the justices to show cause why they should not be punished for contempt of the process of the court, claiming that the act of resignation was a contempt, and that the constitution continued the resigning officers in office until their successors are qualified. The defendants answer the rule by setting up their right to resign as a defence, and excusing their failure to comply with the writ before the resignation on the ground of the agreement with the attorney of the relator. Some of the justices swear that they resigned on account of bad health and other causes not connected with the *mandamus* proceedings, while others rest alone on the legal right of resignation.

*Humes & Poston,* for relator.

*Gantt & Patterson* and *Emerson Etheridge,* for respondents.

HAMMOND, D. J.   I am unable to see why an officer served with a *mandamus* to levy taxes should be compelled to remain in office to discharge that duty any more than to discharge any other duty imposed by law. The *mandamus* directs him to do what by law he should do without it, but does not, in any legal sense, make the duty more binding. *U. S. v. Clark County,* 95 U. S. 769. If an officer is justified in surrendering his office because its duties are disagreeable

to him, or for any reason he does not wish to perform them, why may he not give it up for that reason as well after as before mandatory process, and this without any responsibility for or inquiry into the motive for his action? It seems to me wholly untenable, when an officer has the right of resignation, to hold that he is guilty of contempt of court if he resigns rather than obey a writ of *mandamus.* He cannot delay obedience without contempt, and he remains in contempt as long as he continues in office without obedience. *Hoff* v. *Jasper County,* 20 Am. Law Reg. (N. S.) 435. But if before the opportunity to obey arrives, or before the time prescribed by law for obedience, he resigns effectually or vacates the office, I do not recognize in the act of resignation any contempt, no matter what his motives. The mere fact that the creditor may be thus defeated of his remedy does not furnish a reason, though even this is merely temporary, as the successor is amenable to the same process. *Com'rs* v. *Sellew,* 99 U. S. 624; *Thompson* v. *U. S.* 103 U. S. 480, 484; *U. S.* v. *Labette County,* 7 Fed. Rep. 318, 320. No authority has been produced which supports the contrary doctrine, and I think these views accord with the general principles involved in the consideration of the subject, and are a proper inference from the cases. *Rees* v. *Watertown,* 19 Wall. 107; *Barkley* v. *Levee Com'rs,* 93 U. S. 258; *Meriwether* v. *Garrett,* 102 U. S. 472, 511–518; *Edwards* v. *U. S.* 103 U. S. 471; *Thompson* v. *U. S. supra.*

The leading question in this case is whether or not these respondents have effectually resigned, or are still the justices of Lauderdale county and liable for a non-compliance with the writ commanding them to levy the tax to pay the relator's judgment. This question depends upon a proper construction of the constitution of Tennessee, and there is no decision of the supreme court of the state to guide the court in its determination.

Prior to the constitution of 1870 there can be but little doubt that the laws of Tennessee permitted to all officers the most unrestricted right of resignation. The resignations of the respondents were tendered according to the Code and accepted by the county court, which was, under the law as it existed, independently of the constitution, sufficient to vacate their offices, although relator's counsel suggest that a formal acceptance is required, which was wanting as to some of the justices. It seems, however, to be generally conceded by the authorities that where the officer or tribunal designated by law to receive resignations has no duty to perform in respect to supplying a successor, the bare receipt of the resignation without objection

amounts to an acceptance.   Dill. Mun. Corp. § 163, and cases cited; McCrary, Elec. § 260, and cases cited; *Edwards* v. *U. S. supra; Thompson* v. *U. S. supra; Olmsted* v. *Dennis,* 77 N. Y. 378; *State* v. *Hauss,* 43 Ind. 105; *State ex rel. Boecker,* 56 Mo. 17. ·

Under the influence of the common law, which was very strict as to the surrender of an office held by patent, requiring that document to be surrendered and cancelled, and the general principle of that system of laws which treated offices as property, whether held by grant from the crown or otherwise, it may be doubtful, particularly in view of its interpretation by the supreme court of the United States in the two cases last above cited, if this rule would apply, and whether a more formal acceptance would not be necessary.   But it is conceded by the court in those cases to be a question of local law in each state, and I have no doubt whatever that under our state law it must be held that receiving without dissent and filing the resignation by the authority appointed to receive it constitute an acceptance and answer the common-law requirement of that ceremony.   2 Meigs, Dig. (2d Ed.) § 746; 3 King, Dig. (2d Ed.) §§ 3973, 3974; T. & S. Code, *passim,* tit. "Officers" and "Resignation."   The authorities are too numerous for citation here.

A justice of the peace who wishes to resign shall make his resignation to the county court of the county of which he may be a justice. Act 1806, *c.* 54, § 1, (T. & S. Code, § 353.).   Whenever a vacancy in the office of a justice of the peace occurs, it is filled by special election to be held for the purpose on ten days' notice.   Act 1835, *c.* 1, § 15, (T. & S. Code, § 342.)   All special elections for county officers, authorized by law, shall be ordered by the sheriff of the county, or the coroner, in case the sheriff cannot act or in case there is no sheriff; and he may proceed without any formal notice of vacancy to hold the election.   Code of 1858, (T. & S. Ed.) §§ 804, 827.   From this it will be seen that the county court, in receiving the resignation, acts independently of the sheriff in holding the election, there being absolutely no connection between the two.   Other provisions of the Code are cited by the learned counsel of respondents requiring the justice on his resignation to turn over his dockets, books, and papers to the nearest justice of the peace who is authorized to issue executions, etc., as showing his untrammelled right of resignation.   T. & S. Code, §§ 4126, 4136, 4139, 4143, all taken from the Act of 1835, *c.* 17.

These provisions of the statutes, which show so conclusively the modification, if not the abrogation, of the common law governing the

resignation of these officers, do undoubtedly take this case out of the rule of *Edwards* v. *U. S.* and *Thompson* v. *U. S. supra,* and bring it within a principle, there discussed, that it is a matter of local regulation that must control this case. But these statutes were all prior to the constitution of 1870, which declares that "every officer shall hold his office until his successor is elected or appointed and qualified." Article 7, § 5, T. & S. Code, p. 108. The former constitutions, under which the foregoing and similar statutes were passed, contained no such provision. It was, however, a principle of the common law that every officer held his office until his successor was qualified, and he could not surrender it without consent of the crown or other appointing power, or the election of his successor where it was an elective office; and this, as we have seen, was the basis of the rule that an acceptance of a resignation was necessary to give that consent and vacate the office. It was manifested by a cancellation of the patent of office, a formal acceptance of the surrender or resignation, or impliedly by the appointment or election of a successor. Indeed, the common law would compel the acceptance of an office, and a refusal to assume it was indictable as an offence. 5 Comyn's Dig. tit. "Officer," B 1; Id. K 4, 9, *passim;* Id. tit. "Justices of Peace," A 1; Bac. Abr. 322m; *Anon.* 12 Mod. 256; *Rex* v. *Mayor of Rippon,* 2 Salk. 433; S. C. 1 Ld. Raym. 563; *Rex* v. *Patteson,* 4 B. & A. 15; *Worth* v. *Newton,* 10 Exch. 247; *Lond n* v. *Headen,* 76 N. C. 72; *Stratton* v. *Oulton,* 28 Cal. 45; *People* v. *Stratton,* Id. 382; *Edwards* v. *U. S. supra; Thompson* v. *U. S. supra.*

Nor was there wanting a solid foundation of good reason for the principle. The services of officers are necessary to organized society; and any hiatus or interregnum tends to disorganization. If one's property, services as a soldier, his very life, in fact, may be taken to preserve society, there is no reason why his personal services, in an official capacity, may not be demanded and insisted on by the state. Enforced jury service furnishes a conspicuous example of the principle, as well as compulsory attendance of witnesses, and there may be others. Our own constitution says:

"No man's particular services shall be demanded, or property taken or applied to public use, without the consent of his representatives, or without just compensation being made therefor." Article 1, § 21, T. & S. Code, p. 82.

Not only is this compulsory service supported under this doctrine of necessity, but likewise under the contract. It is true, the bestowal of an office is not, in the ordinary technical sense, a contract,—at

least, not with us,—but is the imposition of a public trust by agreement between the state and the officeholder.   Why may not the state attach as a condition to the bestowal of the honors and compensation growing out of the trust, that it shall not be surrendered until the state has designated a successor, so that the public interests shall not suffer?   It must be admitted that under our free American institutions there has grown up a tendency to recognize such unrestrained personal liberty that the citizen has acquired a sort of right to refuse to serve the state in any official capacity, and it is often said that no man can be compelled to hold an office against his will; but *non constat* that the state may not reasonably restrain this right for the public good.   There can be no more reason for requiring an officer, whose term has expired, to hold till his successor is qualified, than for making the same requirement of one who resigns; one is as great a burden as the other.   Counsel say this is a "momentous question;" but, reduced to its exact dimensions, it is simply a defence by these respondents of the right to retire from their offices some 10 days sooner than under this construction of the constitution and laws of the state they would be permitted to do; and in furtherance of their rights to do this they insist that the words of the provision should be restricted so as to exclude them from its operation.   It is no great hardship to say to a justice of the peace that he shall continue in office until his successor is elected and qualified, when that process, in due course of law, can be consummated in some 15 days. And it will be found that, as to all offices, the constitution and statutes make abundant provision for very speedily supplying a successor to a resigning officer, and ordinarily there is no lack of patriotic citizens ready to take advantage of the rare opportunity of becoming a successor to one resigning.   On the other hand, it may be said, as it has been argued here, that this abundant provision for supplying successors is the only remedy the law has afforded for the evil of having an office vacant, and that the law-makers considered that speedy process of filling vacancies an ample guaranty against the mischief.   But this case illustrates the contrary.   Where there is an epidemic of resignations, caused by a conspiracy to defeat the law, which will, and has in this case, destroyed the machinery of local government, and paralyzed all governmental functions so far as they pertain to those assumed by these respondents, the wisdom of the common-law rule becomes obvious.   Here, although the sheriff or coroner is required, by fair implication, to give immediate notice of

election to be held in 10 days, no steps have been taken for many months to supply the county with these officers so necessary to execute the laws. Much has been said in argument about provisions made to turn the books and papers over to the nearest justice. That is beside the question; because, while the six or seven remaining justices in this county may suffice to discharge the judicial duties, no provision is made to prevent a disorganization of the county by this conspiracy of the magistrates, the sheriff, and no doubt the people of the county, to avoid the levying of this tax, although it results in leaving all other duties belonging to the county court in its ministerial capacity undischarged.

It is a paralysis of this governmental agency, and, if permitted to continue, destroys it effectually. I am unable to see why a construction of the constitution should be adopted which allows this mischief to prevail, when the other would effectually remedy it, for the mere purpose of securing to officers unrestricted liberty to surrender their offices at will, or why this freedom of the citizen should be secured at the expense of so great a calamity to the public good. The case comes within the letter and spirit of the constitutional provision, and the mischief is clearly within the remedial efficacy of the clause. It is a presumption of law that the convention saw the evil of the former policy of unrestricted resignations, and desired to restore the rule of the common law for the public good, that no officer shall abandon the discharge of his duties until his successor has been elected or appointed and qualified. It is a wise provision, one within the power of the state to make, and the courts are required to liberally construe it in favor of the remedy and to prevent the mischief. Cooley, Const. Lim. (4th Ed.) 71, 72, 74, 75, 79; Story, Const. §§ 300, 401; Sedgwick, Stat. & Const. Law, 359, 491. The legislature has given this constitutional provision effect by enacting a statute *in totidem verbis*. Act 1870, c. 23, § 7, (T. & S. Code, § 825*g*.) It is very strenuously argued that this provision was only intended to apply to officers whose terms had expired, and to accommodate the change made by the constitution of 1870 in the tenure of offices. Under the construction of the old constitution, when a vacancy occurred the person elected to fill it held for a full and not an unexpired term, while the new constitution abrogates that construction, and gives fixed terms of office, which expire at the completion of the term, whether held by the original incumbent or one supplied to fill a vacancy. T. & S. Code, 109, note *a*. There is no apparent reason why the clause we are construing was more needed under

the new constitution than under the old, for it could have been applied as well under the one as the other system of terms, and would have been just as wise.    There is nothing in the constitutional provision itself to indicate such a restriction, nor in the proceedings of the convention, and the mischief to be remedied comes clearly within the words, and, I think, the spirit of the clause.    It is also argued that the court should not assume an intention to abrogate the settled policy of the former statutes permitting unrestricted right of resignation.    But it may be remarked that the constitutional convention of 1870 was a reform convention, and the radical changes it made are evidenced throughout the whole instrument, particularly in this matter of office tenure; and a constitutional convention is supposed to act with a purpose to cure existing evils and with a foresight of those that are possible.    If it had intended to prevent the occurrence of the disorganization of a county government, such as the product of this conspiracy, it would have used the very language it has used.    If it had intended to restrict the provision to officers whose terms had expired, it would have said: "All officers whose terms have expired shall hold their offices until their successors are elected or appointed and qualified;" but it does not say this.    It says "every officer" shall so hold, and this includes those about to resign.    He may resign and create a vacancy *sub modo* which authorizes the election or appointment of a successor, but he cannot abandon his office until that successor is qualified.    It is said this literalism would continue officers removed for crime, but this is not a reasonable construction.    There is a paramount public policy which would endure the mischief of an absolute vacancy rather than have offenders in office continue to discharge its duties.    The removal statutes are penal in their nature, and come under the general principle that crime must be punished at all hazards.    *Hyde* v. *State*, 52 Miss. 665; *Allen* v. *State*, 32 Ark. 241.

On the whole case, after a most careful consideration, I am thoroughly satisfied, notwithstanding the strong conviction I had at first the other way, that, on principle, the proper construction of our constitution is that under this clause and the statute to give it effect all officers resigning must continue to discharge their official duties until their successors are elected and qualified.    The case of *Badger* v. *U. S.* 93 U. S. 599, is a direct authority for this construction, and is conclusive here, in the absence of any contrary construction by the supreme court of the state.    *Vide* S. C. 6 Biss. 308. There are some cases which support a contrary view, as *Olmsted* v.

*Dennis, supra,* but they cannot prevail in this court over the views expressed by the supreme court of the United States.

This attitude of the case renders it unnecessary to consider the other points so much argued arising out of the failure to act before resignation, when there was an opportunity to obey the writ and the effect of the negotiations with the relator's attorney to excuse obedience. It may be said, however, that several of the respondents show no excuse, except the pendency of negotiations for a compromise; and it is doubtful if the attorney's action, taking it for all that can be claimed, afforded any justification. The magistrates certainly acted in bad faith to him in conspiring to defeat a levy by resignations after his indulgence. There was an implied understanding that if the compromise failed the writ would be obeyed, and it was a fraud on the relator to act otherwise. The whole case shows a deliberate intention on the part of these officers, no doubt in obedience to popular sentiment, to circumvent the obligation imposed by law to levy the tax to pay these bonds. I have been inclined to at once impose as a penalty for this contempt the whole judgment as a fine, distributing the sum among the respondents according to their respective abilities to pay, and to commit them until the fines and costs were paid and the writ obeyed; but, on reflection, I have concluded to afford another opportunity for obedience to the writ of *mandamus,* having received assurances that if the court decides the resignations ineffectual no further resistance will be made to the process. The court therefore adjudges respondents in contempt of its process, but for the present withholds sentence, and directs an *alias mandamus* to issue requiring these respondents, and their successors in office, to levy the tax at the next regular levy in April, as other taxes are levied, and to collect the same as required by law; and until it shall be made known to the court how the writ has been obeyed, all other matters are reserved.

So ordered.

NOTE. By an able review of this case by Robert W. Haywood, Esq., printed in the Brownsville (Tenn.) *Democrat,* I am reminded of an unintentional omission to notice an argument, made also at the bar on the trial of this case, that the construction adopted would continue officers removing from the county or state in their offices. Our constitution itself provides that justices of the peace and constables removing from the civil district shall vacate the office, which makes an exception to the general rule of the clause construed in the principal case. Article 6, § 15. Perhaps a paramount public policy analogous to that so declared would make an exception in all cases of

removal from the county or state, but it does not seem to me that the existence of that policy, any more than in case of removal for crime, should abrogate that on which the decision of the principal case is attempted to be founded. The same reply may be made to the argument of the reviewer, that the decision of the principal case would abolish the rule that the acceptance of an incompatible office operates as a resignation of the first. And if the rule of the common law, that all officers were to hold until their successors were qualified, never obtained in Tennessee, and was, therefore, not *restored* by the constitution, it only, it seems to me, amounts to saying it was *ordained* by the clause construed. F. S. H.