PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-4471
_____

IN RE: THE HONORABLE LEON A. KENDALL,
Petitioner
_____

On Writ of Certiorari to the Supreme Court
of the Virgin Islands
Supreme Court Misc. No. 2009-0025

Argued December 6, 2012

Before: SMITH, HARDIMAN, and ROTH, *Circuit
Judges*

(Filed: April 3, 2013)


Samuel H. Hall, Jr.         [ARGUED]
Hall & Griffith
No. 91B Solberg
P.O. Box 305587
St. Thomas, VI 00803
    *Counsel for the People of the Virgin Islands*

Howard M. Cooper        [ARGUED]
Julie E. Green
Todd & Weld
28 State Street
31st Floor
Boston, MA 02109
        *Counsel for Leon A. Kendall*

The ACLU Affiliates of New Jersey,
Pennsylvania, and Delaware
Lawrence S. Lustberg
Joshua C. Gillette
One Gateway Center
Newark, NJ 07102
        *Counsel for Amici Curiae in Support*
        *of Leon A. Kendall*

————————————————

OPINION

————————————————

SMITH, *Circuit Judge.*

As Alexander Hamilton famously explained, courts have "no influence over either the sword or the purse." The Federalist No. 78 (Alexander Hamilton). They have "neither FORCE nor WILL but merely

judgment." *Id.* Except for the persuasiveness of their decisions, courts can compel obedience to their orders only through their inherent power of contempt. *Int'l Union of United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 831 (1994) (describing the "inherent contempt authority" as a power "necessary to the exercise of all other[]" judicial powers (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812))). The contempt power, however, is limited to "those instances where the court must vindicate its authority." *Waste Conversion, Inc. v. Rollins Envtl. Servs.*, 893 F.3d 605, 612 (3d Cir. 1990). It is "not made for the protection of judges who may be sensitive to the winds of public opinion. Judges are supposed to be [people] of fortitude, able to thrive in a hardy climate." *Craig v. Harney*, 331 U.S. 367, 376 (1947).

After the Virgin Islands Supreme Court issued a writ of mandamus in a criminal case presided over by former Superior Court Judge Leon A. Kendall, he published an opinion chastising the mandamus decision and recusing himself from the case due to alleged prosecutorial misconduct. The Justices cited Kendall for criminal contempt and eventually found him guilty because his opinion, in their view, obstructed the administration of justice and because his recusal was pretextual in that he sought to avoid complying with the writ of mandamus.

Kendall asks us to reverse his convictions. He argues that his judicial opinion is protected by freedom of speech and cannot therefore serve as a basis for criminal contempt. As to that novel question, we hold that the First Amendment protects a sitting judge from being criminally punished for his opinion unless that opinion presents a clear and present danger of prejudicing ongoing proceedings. Kendall's opinion did not pose such a threat. We also agree with Kendall that there is insufficient evidence that his recusal was pretextual. Consequently, we will reverse the Virgin Islands Supreme Court's judgment and vacate all of Kendall's contempt convictions.

I.

A.    The Underlying Criminal Case

Kendall's criminal-contempt convictions arose from actions he took while presiding over *People v. Ford*, a criminal trial of Basheem Ford and Jermaine Paris for killing an off-duty police officer. *See generally* Crim. Nos. 76/2008, 109/2008 (V.I. Super. Ct. July 7, 2009). The prosecutor, Assistant Attorney General Jesse Bethel, Jr., initially charged Ford and Paris with manslaughter (among other crimes) in January 2008 but later added charges of first-degree assault and first- and second-degree murder.

Bethel subsequently expressed "serious doubt" to

4

his supervisor about whether he could successfully convict Ford and Paris of more than voluntary manslaughter. Although he later admitted that his prosecutorial duties required him not to pursue charges about which he had "serious doubt[s]," Bethel left the murder charges pending and began plea negotiations with counsel for Ford and Paris.

On January 16, 2009, Bethel left a voicemail with the defendants' counsel that offered Ford and Paris a plea bargain to involuntary manslaughter in exchange for dismissal of the remaining charges—an offer they accepted ten days later. Bethel then reversed course, claiming that he had offered a plea deal to *voluntary* manslaughter and denying that any plea deal existed for *involuntary* manslaughter. *People v. Ford*, 52 V.I. 30 (V.I. Super. Ct. July 7, 2009) (depublished). Ford and Paris each moved to enforce the involuntary-manslaughter offer. During argument on the motions before Kendall, Bethel said that even though he might "have misspoken" or the defendant's counsel may have "misunderstood" the deal, he also insisted that he "made it very clear" that "the deadline to respond [to the offer]" was January 26, 2009, and that the defendants had not done so. But a voicemail of Bethel's plea offer told a different story. That recording "unambiguously" revealed that Bethel's offer was for involuntary manslaughter—not voluntary manslaughter, as Bethel

5

had later claimed—and that Bethel had never imposed any deadline for the defendants to accept the offer.

Based on this evidence, Kendall concluded that Bethel misrepresented his plea offer to the Court and held that the defendants' acceptance of Bethel's offer had created a binding plea agreement. Accordingly, Kendall scheduled a change-of-plea hearing for February 2, 2009 at 4:00 p.m., cancelling jury selection and the jury trial. Unhappy with this course of events, Bethel repeatedly interrupted and traded jabs with Kendall, who admonished him several times. That back-and-forth culminated with Bethel informing Kendall that he would not be present for the change-of-plea hearing. Kendall responded that he did not "need to know that" and proceeded to schedule the change-of-plea hearing anyway.

On the morning of the hearing, Bethel appealed Kendall's decision to enforce the oral plea offer to the Virgin Islands Supreme Court. And consistent with his earlier promise, he did not show up for the change-of-plea hearing at 4:00 p.m. that afternoon. After waiting fifteen minutes without any sign of Bethel, Kendall adjourned the hearing, held Bethel in contempt, and issued a warrant for his arrest. At about 4:30 p.m., Bethel was arrested and remained under the control of the Bureau of Corrections until the next morning. At the time, Bethel told the media and the Virgin Islands

Supreme Court that he had been incarcerated overnight—a statement that was later revealed to be false when Bethel admitted that the warden had allowed him to spend the night at home without judicial authorization and without the $10,000 bail set by Kendall.

At a hearing the next day, Bethel apologized to Kendall for his "tardiness" and explained that he was "in the process of filing papers" and "looking for a parking space." Although Kendall concluded that these explanations were false, he accepted an apology from Bethel and "defer[red]" from any decision to hold him in contempt. Kendall never revisited the issue of Bethel's contempt. At the end of the hearing, Kendall returned to the issue of whether the plea offer for involuntary manslaughter was enforceable. Kendall asked Bethel and defense counsel to submit supplemental briefing on *Virgin Islands v. Scotland*, 614 F.2d 360 (3d Cir. 1980), a Third Circuit case holding that a prosecutor may withdraw a plea offer at any time before the court accepts it unless the defendant detrimentally relies on the offer by, for example, pleading guilty. Kendall stated that "if *Scotland* is dispositive, the Court will proceed to trial; if not, the Court will enforce the plea agreement."

Beginning that same day, the Virgin Islands Daily News published several articles about Bethel's arrest, detention for contempt, and eventual release. One of the

articles recounted Bethel's earlier misrepresentations at the hearing about the oral plea offer.

On February 5, Bethel moved for reconsideration of Kendall's decision to enforce the plea agreement to involuntary manslaughter, but Kendall denied that motion. He concluded that the revelation of the plea agreement in numerous press reports (including the Daily News article) had tainted the jury pool and therefore made it impossible for Ford and Paris to receive a fair trial. Consequently, he reasoned that Ford and Paris had detrimentally relied on the plea agreement, and so he had to enforce it. Kendall then rescheduled the change-of-plea hearing for March 11, 2009.

B.     The Writ of Mandamus Against Judge Kendall

Following Kendall's decision to enforce the plea agreement for involuntary manslaughter, Bethel filed an amended notice of appeal with the Virgin Islands Supreme Court, indicating that there was no factual basis for acceptance of a guilty plea to involuntary manslaughter. Bethel simultaneously petitioned the Virgin Islands Supreme Court for a writ of mandamus directing Kendall not to enforce the plea agreement.

In the petition, Bethel made several mischaracterizations and also took swipes at Kendall. He claimed that Kendall had publicly "commented on [*People v. Ford* in a manner] adverse to the People's

8

position as reported in the Virgin Islands Daily News." He said that Kendall "participated in plea negotiations directly by . . . mandating what the plea agreement should be in its entirety." And in reference to his absence from the initial change-of-plea hearing, Bethel claimed that he had told Kendall "he would not be appearing on Monday, February 2, 2009, for the Change of Plea, but he did not say and never intended to convey that he would not be appearing at all." Kendall declined the Virgin Islands Supreme Court's invitation to appear in the mandamus action in response to Bethel's petition.

The Virgin Islands Supreme Court denied Bethel's direct appeal because Kendall's rulings were not yet final but granted his petition for mandamus. According to the Virgin Islands Supreme Court, settled United States Supreme Court precedent establishes that the "government may unilaterally withdraw a plea offer, even if . . . the defendant" promises to accept the offer, because a "plea agreement, as a unilateral contract, cannot become binding on the parties through the defendant's mere promise of performance but by the defendant's actual performance—a change of plea to guilty." And although a limited exception to this rule exists when the defendant detrimentally relies upon a plea offer, *see Scotland*, 614 F.2d at 365, the Virgin Islands Supreme Court concluded that Ford and Paris had not detrimentally relied on the plea offer to involuntary manslaughter at the time it was withdrawn. In the Virgin

9

Islands Supreme Court's view, Kendall had incorrectly and prematurely concluded that the defendants could not get a fair trial. Rather, Kendall was required "'at the very least . . . [to] conduct[] an immediate *voir dire* inquiry to determine if the jurors had read the [media reports] and, if they had, whether they could nevertheless render a fair and true verdict.'" *Id.* (quoting *United States v. New Jersey*, 519 F.2d 1356, 1357 (3d Cir. 1975)). In addition, Kendall had "'an affirmative constitutional duty to minimize the effects of [any] prejudicial pretrial publicity.'" 2 App. 16 (quoting *United States v. Scarfo*, 263 F.3d 80, 90 (3d Cir. 2001)). Consequently, "even if [Kendall] could have properly . . . found that pretrial publicity prejudiced [Ford and Paris], [he] was still obligated to employ less drastic curative measures, such as a continuance or change of venue, prior to ordering the extreme remedy of specific performance of a withdrawn plea offer."

In issuing its writ of mandamus on May 13, 2009, the Virgin Islands Supreme Court reversed Kendall's orders enforcing the oral plea offer, vacated his order scheduling a change-of-plea hearing for March 11, 2009, and remanded the case "for proceedings consistent with" its opinion. The writ did not provide any additional instructions to Kendall.

C. <u>Kendall's Subsequent Opinion and Recusal</u>

After the writ of mandamus issued, Ford and Paris accepted Bethel's offer to plead guilty to voluntary manslaughter, and Kendall scheduled a change-of-plea hearing. At the hearing, Bethel proffered what the evidence would show at trial, and Kendall conducted a plea colloquy with Ford and Paris to determine whether they agreed with Bethel's account. Ford and Paris, though, stuck to their story that they were acting in self-defense. And that story was consistent with Bethel's own review of the evidence: in a 2008 memorandum to his superiors, Bethel concluded that the victim "initiated a deadly confrontation with [Ford] by threatening and chasing him with an ax handle which unfortunately resulted in the death of [the victim] by gunshots from the defendants." Kendall concluded (and Bethel agreed) that there was an insufficient factual basis to support the defendants' guilty plea to voluntary manslaughter. As a result, Kendall had no choice but to reject the pleas and plea agreement.

Rejecting the plea agreement left Kendall in what he considered a difficult situation. Notwithstanding the insufficient factual basis for voluntary manslaughter and Bethel's own "serious doubt," Bethel "unequivocally" planned to prosecute Ford and Paris for not only the voluntary manslaughter, but also first-degree assault, first- and second-degree murder, aiding and abetting

11

third-degree assault, and unauthorized possession of a firearm. That decision to pursue the more-serious charges, as Kendall noted, contradicted Bethel's own factual proffer on how the victim died: first-degree assault requires "intent to murder" and murder requires proof of "malice aforethought," yet Bethel's own factual proffer showed that it was the *victim* who "initiated a deadly confrontation" with the defendants. In Kendall's view, Bethel's continued pursuit of these unsupported charges would "be tantamount to perpetrating a fraud upon the Court."

But Kendall recognized that he had "to follow [the Virgin Islands Supreme Court's] directions with respect to the disposition of this matter." And having rejected the plea agreement, Kendall's "only alternative [was] to have this matter set down for trial according to the Supreme Court." With those determinations made, Kendall promised the parties that he would memorialize his reasons for rejecting the plea agreement in a written opinion.

On July 7, 2009, Kendall filed a thirty-one page opinion "for publication." As promised, the *Ford* opinion recounted the background of the criminal case, including the events that gave rise to the writ of mandamus, and memorialized his reasons for rejecting the plea agreement to voluntary manslaughter. But the opinion also took two unexpected turns, both of which

12

later became the basis for Kendall's criminal-contempt convictions: First, the opinion offered a point-by-point denunciation criticism of the Virgin Islands Supreme Court's decision to issue the writ of mandamus. The opinion characterized the Virgin Islands Supreme Court's reasoning as erroneous, "improper," having "no rational basis," lacking "merit," and "making no sense." *In re Kendall*, S. Ct. Misc. No. 2009-0025, 2011 WL 4852282, at *4 & n.6 (V.I. Oct. 12, 2011). Indeed, the opinion went so far as to say that the writ of mandamus "was apparently sought and issued to facilitate [Bethel's] blatant misconduct and perpetrate a fraud on the [Superior] Court." *Id.* at *4 n.6. Its issuance, Kendall wrote scathingly, was therefore "contrary to law and all notions of justice." *Id.*

Second, Kendall recused himself from presiding over further proceedings in the *Ford* case. Because of Bethel's misrepresentations concerning the oral plea agreement and his continued pursuit of more-serious charges that contradicted his own factual proffer, Kendall lost the ability to believe "any of [Bethel's] further representations" in the *Ford* case. Moreover, Bethel's decision to press the unsupported, more serious charges enhanced Kendall's nagging concern that the extensive pretrial publicity would deny the defendants' their Sixth Amendment rights to a fair and impartial jury. In short, Kendall said he could no longer "be a party to [Bethel's] egregious misconduct."

13

After Kendall issued this opinion, *People v. Ford* was reassigned to James S. Carroll III. Judge Carroll held a pretrial conference on July 23, 2009. The People were not prepared to proceed to trial at that time because certain witnesses were unavailable. So Judge Carroll scheduled jury selection and trial for November 23, 2009.

Meanwhile, Ford and Paris petitioned the Third Circuit for a writ of certiorari to review the Virgin Islands Supreme Court's writ of mandamus and its conclusion that Bethel's plea offer for involuntary manslaughter was not enforceable. When November 23 arrived, the government indicated that it was not prepared to begin trial because it was awaiting a ruling by the Third Circuit on the defendants' certiorari petition. In fact, the Third Circuit had denied the petition a few days earlier on November 17. Judge Carroll nonetheless continued jury selection until April 12, 2010, at the request of Paris's counsel because two defense witnesses either could not be located or had to be flown to the Virgin Islands. Although Ford died before he could go to trial, a jury ultimately acquitted Paris.

D.     The Criminal-Contempt Charges Against Kendall

The Virgin Islands Supreme Court did not take Kendall's recalcitrance lying down. They had no mechanism for disciplining Kendall: in an earlier challenge by Kendall, the statute authorizing the Virgin

Islands Commission on Judicial Discipline to investigate and remove Superior Court judges was struck down by this Court as unconstitutional. *See Kendall v. Russell*, 572 F.3d 126, 138 (3d Cir. 2009). Nor had the Virgin Islands Supreme Court yet issued new disciplinary rules applicable to judges.

Believing that they had no other alternatives, the Justices ordered Kendall to show cause why he should not be held in criminal contempt. That show-cause order charged Kendall with three counts of indirect[1] criminal contempt:

---

[1] Contempt can be either direct or indirect. *See United States v. Dixon*, 509 U.S. 688, 723 n.1 (1993) (White, J., concurring in the judgment in part and dissenting in part) ("The distinction between, on the one hand, direct and summary contempt (*i.e.*, contempt for acts occurring in the courtroom and interfering with the orderly conduct of business), and, on the other hand, nonsummary contempt, possesses old roots in the [Supreme] Court's cases."). Direct contempt describes "the judge's authority to [summarily] impose punishment, without any form of trial, on one who engages in contumacious behavior in the judge's presence," such as a party's repeated outbursts during a hearing or a witness's refusal to testify during trial. Earl C. Dudley, Jr., *Getting Beyond the Civil/Criminal Distinction*, 79 Va. L. Rev. 1025, 1030

15

(1) <u>Count 1:</u> Obstructing the administration of justice by issuing the *Ford* opinion critical of the Justices' writ of mandamus;

(2) <u>Count 2:</u> Failing to comply with the writ of mandamus by refusing to schedule *People v. Ford* for trial, refusing to consider a change of venue or continuance to minimize pretrial publicity, and recusing himself to avoid complying with the writ of mandamus; and

(3) <u>Count 3:</u> Misbehaving in his official transactions as an officer of the court by issuing his *Ford* opinion and disobeying the writ of mandamus.

The Virgin Islands Supreme Court appointed a special prosecutor to pursue the criminal-contempt charges and a Special Master to rule on all non-dispositive motions, manage discovery, preside over the trial, and recommend findings of fact and conclusions of law. Much like the relationship between a magistrate

---

(1993). Indirect contempt targets acts "committed outside the presence of the court for which some fact-finding process is concededly necessary," such as a person's refusal to obey a court order. *Id.*

16

judge and a district judge, *see generally* 28 U.S.C. § 636, the Justices had the ultimate authority to adopt or reject the Special Master's recommendations.

Before trial, Kendall moved to disqualify all three Justices of the Supreme Court because they were the target of his opinion's criticism. The Justices denied this motion, and Kendall's case proceeded to trial. After the People rested, Kendall moved for a judgment of acquittal based on insufficient evidence. He also moved for a mistrial, arguing that the Justices violated his due-process right by not personally attending the trial and observing the witnesses' live testimony before making findings of fact in the case. The Special Master recommended denial of this motion, and the Supreme Court adopted that recommendation.

At the conclusion of the trial, the parties submitted proposed findings of fact and conclusions of law to the Special Master. The Special Master recommended that Kendall be acquitted on all charges. After considering supplemental briefs from both sides and reviewing a video recording of a "majority" of the proceedings before the Special Master, the Virgin Islands Supreme Court rejected the Special Master's ultimate recommendation of acquittal and found Kendall guilty on all counts.

In sentencing Kendall, the Justices ordered him to pay a $1,000 fine on Count 1[2] but stayed sentencing for the remaining charges because all three charges arose from the same conduct. The Supreme Court also depublished Kendall's *Ford* opinion.

E.    This Appeal

Kendall sought review of his convictions by petitioning this Court for a writ of certiorari.[3] We granted his petition on the following questions:

---

[2] The Virgin Islands Supreme Court subsequently stayed payment of the fine pending our review.

[3] The Virgin Islands Supreme Court had inherent and statutory jurisdiction over Kendall's contempt proceeding. *See* 4 V.I. Code § 243(4) ("Every court shall have power . . . [t]o compel obedience to its judgments, orders, and process, and to the orders of a judge out of court, in all actions, or proceedings pending therein[.]"); 4 V.I. Code § 281(2) ("Every judicial officer shall have power . . . [t]o compel obedience to his lawful orders[.]"); *Young v. United States*, 481 U.S. 787, 793 (1987) ("[I]t is long settled that courts possess inherent authority to initiate contempt proceedings for disobedience to their orders . . . ."). We have certiorari jurisdiction under 48 U.S.C. § 1613, which grants the Third Circuit certiorari jurisdiction to review final decisions of the Virgin Islands Supreme Court. *See*

18

1. Whether the First Amendment limits the imposition of criminal contempt for statements made in a judge's written opinion and if so, the scope of the limitation and its application in this case;

2. Whether the Virgin Islands Supreme Court erred in imposing criminal contempt on the charges of failure to comply with its mandamus order of May 13, 2009, in *In re People of the Virgin Islands*, V.I. S. Ct. Civ. No. 2009-021;

3. Whether the Virgin Islands Supreme Court Justices erred in not recusing themselves from this matter; and

4. Whether [Kendall] impliedly consented, or waived any challenge, to conducting the show cause hearing before a special master and, if not, the propriety of that procedure.

---

*Kendall v. Daily News*, __ F.3d __, No. 11-4162, 2013 WL 856433 (3d Cir. Mar. 8, 2013) (holding that Congress's recent elimination of the Third Circuit's certiorari jurisdiction over decisions of the Virgin Islands Supreme Court does not affect, at a minimum, certiorari petitions filed before the effective date of the jurisdiction-stripping act).

## II.

On Count 1, Kendall was convicted of indirect criminal contempt for obstructing the administration of justice by publishing inflammatory remarks about the Virgin Islands Supreme Court in his *Ford* opinion. Kendall argues that the remarks in his *Ford* opinion are protected by freedom of speech and therefore cannot serve as a basis for his conviction.[4] We agree.

---

[4] The ACLU, as amicus, argues that Kendall is shielded from criminal contempt by absolute judicial immunity. According to the ACLU, "if judges are immune from *civil* liability from third parties even for judicial actions done maliciously, with an improper motive, in bad faith, or which are unfair or controversial, then . . . they ought not face *criminal* liability for a mere written opinion." ACLU Br. at 11. We do not need to address this argument because it is not properly before us. Judicial immunity is outside the questions on which we granted certiorari. *See* 3d Cir. LAR 112.10(a) ("If a petition for writ of certiorari is granted, . . . the case shall proceed as other appeals [do] . . . but with review limited to the questions on which the writ of certiorari was granted."); *see also Izumi Seimitsu Kogyo Kabushiki Kaisha v. U.S. Philips Corp.*, 510 U.S. 27, 32–33 (1993) (explaining the limited categories of "unusual circumstances," in which the Court would consider an issue on which certiorari

was not granted, such as "the possible absence of jurisdiction" (quotation marks and citations omitted)). What's more, Kendall did not raise this argument before the Virgin Islands Supreme Court or in any of his briefs before this Court. *See AT&T, Inc. v. FCC*, 582 F.3d 490, 495 (3d Cir. 2009) ("An appellant waives an argument in support of reversal if he does not raise that argument in his opening brief."), *rev'd on other grounds*, *FCC v. AT&T, Inc.*, 131 S. Ct. 1177 (2011).

In any event, Kendall would not be able to shoulder his burden of showing that he is entitled to judicial immunity from criminal contempt. *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 432 n.4 (1993). Judicial immunity is a common-law doctrine designed to protect judicial independence. *Nixon v. Fitzgerald*, 457 U.S. 731, 759 n.2 (1982) (Burger, C.J., concurring) ("[T]he Constitution provides no hint that either judges, prosecutors, or congressional aides should be so protected [through absolute immunity]. Absolute immunity for judges and prosecutors is seen to derive from the common law and public policy . . . ."). And while "[f]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction," *Cleavinger v. Saxner*, 474 U.S. 193, 200 (1985) (quoting *Pierson v. Ray*, 386 U.S. 547, 553–54 (1967)), the same was not true for contempt or criminal

21

liability, *Mireles v. Waco*, 502 U.S. 9, 10 n.1 (1991) (recognizing that "a judge is not absolutely immune from criminal liability")); *O'Shea v. Littleton*, 414 U.S. 488, 503 (1974) (same). As the Supreme Court has recognized, at common law, superior courts routinely used their contempt power to hold inferior judges accountable for violating their writs and orders. *Pulliam v. Allen*, 466 U.S. 522, 532 n.19 (1984) (noting that a judge to whom a writ of mandamus or prohibition is issued "risks contempt for violating the writ," and that "although courts properly are reluctant to impose costs against a judge for actions taken in good-faith performance of his judicial responsibilities, a court, in its discretion, may award costs against a respondent judge"); *see, e.g.*, *United States v. Justices of Lauderdale Cnty.*, 10 F. 460 (Cir. Ct., W.D. Tenn. 1882); *Lapique v. Superior Court of L.A. Cnty.*, 229 P. 1014 (Cal. Dist. Ct. App. 1924); *In re Smith*, 83 P. 167 (Cal. Dist. Ct. App. 1905); *Pittman v. Hagans*, 91 Ga. 107 (1892); *Havemeyer v. Superior Court of City and Cnty. of S.F.*, 87 Cal. 267, 275 (1890); *In re Cary*, 10 F. 622, 631 (S.D.N.Y. 1882); *Gorham v. Luckett*, 45 Ky. 638 (1846); *People v. Pearson*, 4 Ill. 270 (1841); *Floyd v. Barker*, 77 Eng. Rep. 1305 (K.B. 1607); *see also* 3 William Hawkins, <u>A Treatise of the Pleas of the Crown</u> ch. 8 § 74 (7th ed. 1795) ("Justices of the peace are not punishable civilly for acts done by them in their judicial capacities, but if they abuse the authority with which they are

22

entrusted, they may be punished criminally at the foot of the king by way of information."). This practice held fast until codes of judicial conduct and judicial disciplinary commissions were created in the mid-twentieth century. *See* Jeffrey M. Sham, *State Judicial Conduct Organizations*, 76 Ky. L.J. 811, 811 (1987–88) (recounting the history of judicial discipline).

Indeed, there would be little reason to extend judicial immunity to criminal contempt. Unlike the danger that civil liability poses to judicial independence, any threat to judicial independence from criminal liability is "severely curtail[ed]" by "the limitations already imposed" by the exceptional nature of mandamus and the constitutional protections for criminal prosecutions (such as the right to a trial by jury, burden of proof, and presumption of innocence). *Pulliam*, 466 U.S. at 537–38 (rejecting Justice Powell's dissenting argument that the "specter of contempt proceedings [against a judge who] violat[es] . . . injunctive orders is likely to inhibit unbiased judicial decisionmaking as much as the threat of liability for damages"). And an inferior-court judge's freedom to disobey a superior court's order is not the sort of independent judicial decision-making that immunity is designed to protect. *Accord United States v. Claiborne*, 727 F.2d 842, 847–48 (9th Cir. 1984) (rejecting a judge's argument that separation-of-powers concerns should prevent executive officers from prosecuting federal

23

A.    The Scope of Constitutional Protection for Judicial Speech

The Supreme Court has yet to address the scope of a judge's freedom of speech as a sitting judge. *See Republican Party of Minn. v. White*, 536 U.S. 765, 796 (2002) (Kennedy, J., concurring) ("This case does not present the question whether a State may restrict the speech of judges because they are judges—for example, as part of a code of judicial conduct; the law here regulates judges only when and because they are candidates."). Yet other federal and state courts have repeatedly held that a "judge does not check his First Amendment rights at the courthouse door, to be reclaimed at the expiration of his judicial tenure."[5] *In re*

---

judges for acts involving exercise of their judicial power); *United States v. Hastings*, 681 F.2d 706, 710–11 (11th Cir. 1982) (same); *United States v. Isaacs*, 493 F.2d 1124, 1140–44 (7th Cir. 1974) (same). With no support in history, law, or logic, we cannot extend judicial immunity to criminal contempt. *Cf. Dennis v. Sparks*, 449 U.S. 24, 29 (1980) (rejecting an extension of derivative judicial immunity because the petitioners had "pointed to nothing indicating that, historically, judicial immunity insulated from damages liability those private persons who corruptly conspire with the judge").

[5] *E.g.*, *In re Vincent*, 172 P.3d 605, 607 (N.M. 2007) ("[W]e    recognize    that    there    are    nevertheless

24

*Judicial Misconduct*, 632 F.3d 1289, 1289 (9th Cir. Jud. Counc. 2001) (Kozinksi, C.J., sitting alone).

We agree. What a judge says in an opinion is sufficiently expressive to trigger First Amendment review. The judge "inten[ds] to convey a particularized message" by explaining his legal analysis and conclusions, and there is a "great" likelihood that the opinion's message would be understood by its audience—no less than if the judge had published the same analysis and commentary in a law review article.[6] *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quotation marks and citations omitted). Indeed, as pure speech on

---

constitutional limitations on the regulation of judicial speech."); *In re Sanders*, 995 P.2d 369, 375 (Wash. 1998) ("A judge does not surrender First Amendment rights upon becoming a member of the judiciary.").

[6] We do not decide, however, whether a judge's ultimate rulings and judgments (as opposed to the explanations and commentary offered in opinions) also trigger First Amendment review. *See Nev. Comm'n on Ethics v. Carrigan*, 131 S. Ct. 2343, 2351 n.5 (2011) ("A legislator *voting* on a bill is not fairly analogized to one simply *discussing* that bill or *expressing* an opinion for or against it. The former is performing a governmental act as a representative of his constituents; only the latter is exercising personal First Amendment rights." (emphasis added) (citations omitted)).

public issues, a judicial opinion "occupies the highest rung of the hierarchy of First Amendment values" and is thus "entitled to special protection." *Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011) (quotation marks and citations omitted). To be sure, the rationale and holdings in an opinion often carry the force of law, but the mere fact that an opinion has legal effect does not "somehow deprive[] [an opinion] of its expressive component." *Doe v. Reed*, 130 S. Ct. 2811, 2818 (2010); *see also Nev. Comm'n on Ethics v. Carrigan*, 131 S. Ct. 2343, 2351 (2011) ("It is one thing to say that an inherently expressive act remains so despite its having governmental effect, but it is altogether another thing to say that a governmental act becomes expressive simply because the governmental actor wishes it to be so. We have never said the latter is true."). No one contends that Kendall's opinion was not speech.

Having concluded that a judicial opinion qualifies as "speech," we must determine the scope of its protection. Kendall argues that a judicial opinion is criminally punishable only under the government's limited authority as sovereign to regulate speech that poses a clear and present danger to the administration of justice. By contrast, the Virgin Islands Supreme Court relied on the government's broader authority to discipline attorneys for speech that is substantially likely to prejudice ongoing proceedings and held that this broader authority allows the government to criminally punish

judicial speech that poses the same threat.[7] We agree with Kendall.

As a general matter, the First Amendment protects freedom of expression regardless of its content or viewpoint and "regardless of whether it is disruptive, offensive, vulgar or insulting." *J.S. v. Blue Mountain Sch. Dist.*, 650 F.3d 915, 936 (3d Cir. 2011) (en banc) (Smith, J., concurring). Yet that rule is not absolute. When acting as sovereign, the government is empowered to impose time, place, and manner restrictions on speech, *see Ward v. Rock Against Racism*, 491 U.S. 781, 791

---

[7] Because this case involves a sitting judge's speech about one of his pending cases, we need not decide the constitutional standard for evaluating judicial speech in other contexts, such as a speech about a case over which he is not presiding or about topics unrelated to any pending case. *Cf., e.g.*, *Miss. Comm'n on Judicial Performance v. Wilkerson*, 876 So. 2d 1006, 1011–12 (Miss. 2004) (en banc) (applying strict scrutiny to a state's decision to discipline a judge for his extra-judicial statements on gay rights); *In re Hey*, 452 S.E.2d 24, 33 (W.Va. 1994) ("A judge may not be disciplined consistent with the First Amendment . . . for his remarks during a radio interview in which he discussed his own disciplinary proceedings, criticized a member of his investigative panel, and stated his intention to take some reactive and lawful measure against the panel member.").

(1989), make reasonable, content-based decisions about what speech is allowed on government property that is not fully open to the public, *see Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 674–75 (1998), decide what viewpoints to espouse in its own speech or speech that might be attributed to it, *see Johanns v. Livestock Mktg. Ass'n*, 544 U.S. 550, 560 (2005), and categorically restrict unprotected speech.[8] Sometimes, however, the government acts in a capacity that goes beyond merely being sovereign, and it gains additional authority to regulate speech in those capacities. *See, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 419–20 (2006) (government as public employer); *Morse v. Frederick*, 551 U.S. 393, 369–97 (2007) (government as K-12 educator); *Gentile v.*

---

[8] Examples of categorically unprotected speech include obscenity, *see Miller v. California*, 413 U.S. 15, 23 (1973), child pornography, *see New York v. Ferber*, 458 U.S. 747, 764–65 (1982), advocacy that imminently incites lawless action, *see Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969) (per curiam), fighting words, *see Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942), true threats, *see Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam), commercial speech that is false, misleading, or proposes illegal transactions, *see Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562, 566–67 (1980), and some false statements of fact, *see generally United States v. Alvarez*, 132 S. Ct. 2537, 2546–47 (2012).

*State Bar of Nev.*, 501 U.S. 1030, 1066, 1075 (1991) (government as regulator of attorneys); *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989) (government as prison administrator); *FCC v. Pacifica Found.*, 438 U.S. 726, 748–49 (1978) (government as regulator of broadcast radio and television); *Parker v. Levy*, 417 U.S. 733, 758–59 (1974) (government as military commander).

In the realm of speech about ongoing judicial proceedings, the government's authority as sovereign provides only limited power to criminally punish speech by those outside the judicial system. As the Supreme Court made clear in a trio of cases involving members of the press held in criminal contempt for their news stories, speech about ongoing judicial proceedings is criminally punishable only if it poses a clear and present danger of obstructing or prejudicing the ongoing proceedings. *Craig*, 331 U.S. at 372; *Pennekamp v. Florida*, 328 U.S. 331, 348 (1946); *Bridges v. California*, 314 U.S. 252, 260–63 (1941); *see also Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of Cal. v. Yagman*, 55 F.3d 1430, 1442 (9th Cir. 1995). The government has greater authority to discipline speech about an ongoing judicial proceeding, though, when the speaker is an attorney involved in that proceeding. *See Gentile*, 501 U.S. at 1075. Because the attorney is likely to be viewed as "especially authoritative" and his statements are more "likely to influence the actual outcome of the trial," the government has an overriding interest in

29

limiting the attorney's prejudicial comments to preserve the litigants' constitutional rights to an impartial jury. *Id.* at 1074–75. Consequently, the attorney's speech is subject to discipline at a lower threshold: when it is substantially likely to prejudice the proceedings. *Id.* at 1075.

That brings us to the question in this case: does the government's broader authority to *discipline* attorney speech about ongoing proceedings also permit the government to hold a judge in criminal contempt for his speech about ongoing proceedings? We answer that question with a resounding "No." Criminal contempt is no mere disciplinary tool. It derives, like all crimes, from a government's power as sovereign. *See Eash v. Riggins Trucking, Inc.*, 757 F.2d 557, 565–66 (3d Cir. 1985) ("[A] court's broad power to discipline attorneys as officers of the court for misconduct not properly categorized as contempt is substantially different from the contempt power."); *Cammer v. United States*, 350 U.S. 399, 408 n.7 (1956) ("'The power to disbar an attorney proceeds upon very different grounds' from those which support a court's power to punish for contempt." (quoting *Ex Parte Robinson*, 86 U.S. (19 Wall.) 505, 512 (1873))); *see also Bagwell*, 512 U.S. at 826 (describing criminal contempt as "a crime in the ordinary sense" (quoting *Bloom v. Illinois*, 391 U.S. 194, 201 (1968)). Because the government's use of the criminal-contempt power is the *sine qua non* of a

sovereign act, the government has no greater authority to hold someone in criminal contempt for their speech about ongoing proceedings than it would to criminally punish any speech. The government's additional authority to discipline attorney speech is therefore inapposite. And that means the speech must present a clear and present danger—not just a substantial likelihood—of obstructing the administration of justice. Consequently, the First Amendment protects a judge's opinion from criminal punishment unless his speech poses a clear and present danger to the administration of justice.[9]

---

[9] The Supreme Court has not yet been asked to resolve whether or how *Garcetti*'s government-employer rationale extends to disciplinary restrictions on a judge's on-the-job speech. *See White*, 536 U.S. at 796 (Kennedy, J., concurring) ("Whether the rationale of [our public-employee-speech cases] could be extended to allow a general speech restriction on sitting judges—regardless of whether they are campaigning—in order to promote the efficient administration of justice, is not an issue raised here."); *see also In re Vincent*, 172 P.3d at 608 ("[E]valuating the constitutionality of restrictions on the political speech of a judge does not fit neatly into the existing analytical framework for First Amendment analysis. Selecting the appropriate framework for analysis has become even more difficult since *White*.")

31

The People, however, argue that Kendall's opinion should receive no constitutional protection from criminal punishment. *See* People's Br. at 15–16. The People analogize the Virgin Islands Supreme Court's authority to punish lower-court judges' speech to the government's broad authority as public employer to discipline an employee for speech made pursuant to his official duties, *see Garcetti*, 547 U.S. at 421, and to the government's broad authority as military commander to punish an officer's insubordinate speech towards his superiors, *see United States v. Howe*, 37 C.M.R. 429 (1967).

These analogies fall flat. As we have already explained, contempt is not discipline: the Virgin Islands Supreme Court acted as sovereign, not as public employer, by criminally punishing Kendall's speech. And the Virgin Islands Supreme Court's supervisory capacity over lower-court judges is hardly similar to the government's capacity as military commander. The Supreme Court has long differentiated military-speech restrictions from those in the civilian community based on considerations unique to the military. *See, e.g., Goldman v. Weinberger*, 475 U.S. 503, 507 (1986) ("Our review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations

---

Since that question is not implicated here, we leave it for another day.

32

designed for civilian society. The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment[.]"); *Parker v. Levy*, 417 U.S. 733, 758–59 (1974) ("The armed forces depend on a command structure that at times must commit men to combat, not only hazarding their lives but ultimately involving the security of the Nation itself. Speech that is protected in the civil population may nonetheless undermine the effectiveness of response to command. If it does, it is constitutionally unprotected." (citations omitted)). Those same considerations have no force in a civilian court system: Superior courts do not depend on an instinctive obedience to command structure that is critical to executing split-second battlefield orders. Nor do court systems have a similar need to restrict the role of dissent—unlike the military, the judicial mission depends on courts being deliberative bodies. *Cf. United States v. Grimley*, 137 U.S. 147, 153 (1890) ("An army is not a deliberative body. It is the executive arm. Its law is that of obedience. No question can be left open as to the right to command in the officer, or the duty of obedience in the soldier.").

In summary, the First Amendment prevents the government from criminally punishing a sitting judge's speech about one of his pending cases unless it poses a clear and present danger to the administration of

33

justice.[10] *Cf. Citizens United v. FEC*, 130 S. Ct. 876, 904 (2010) ("If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political

---

[10] The Virgin Islands Supreme Court did not base Kendall's conviction on a conclusion that his words were defamatory. *See Standing Comm. on Discipline of U.S. Dist. Court for Cent. Dist. of Cal. v. Yagman*, 55 F.3d 1430, 1438 (9th Cir. 1995) ("It follows that statements impugning the integrity of a judge may not be punished unless they are capable of being proved true or false . . . .") And no such conclusion would be possible here. Contrary to the Virgin Islands Supreme Court's characterization, Kendall's remarks cannot be reasonably interpreted as "blatantly accus[ing], without proof, the Justices . . . of gross dereliction of their sworn duties and of committing illegal acts." Kendall's statements were nothing more than "rhetorical hyperbole" using language in a "loose, figurative sense" and therefore cannot be interpreted as asserting actual facts about the Justices. *Nat'l Ass'n of Letter Carriers v. Austin*, 418 U.S. 264, 284–85 (1974); *see also id.* at 286 (holding that a union newsletter's description of a "scab" as a "traitor" could not be construed as a factual assertion); *Greenbelt Coop. Publ'g Ass'n v. Bresler*, 398 U.S. 6, 14 (1970) (holding that a description of a public figure's negotiating position as "blackmail" could not be construed as charging the plaintiff with committing a crime).

speech.”).

B.  Whether Kendall's Opinion Crossed the Constitutional Line

We must vacate Kendall's conviction because his opinion did not pose a clear and present danger of prejudicing the ongoing *Ford* proceedings.  In the usual course of reviewing the sufficiency of evidence, we "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Wolfe*, 245 F.3d 257, 261 (3d Cir. 2001) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)).  But "in cases raising First Amendment issues," we have an "obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'"  *Gentile*, 501 U.S. at 1038 (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)).  Consequently, we are "compelled to examine for [ourselves] the statements in issue and the circumstances under which they were made to see whether or not they do carry" the requisite threat to the administration of justice.  *Id.* (quoting *Pennekamp*, 328 U.S. at 335); *see also United States v. Cutler*, 58 F.3d 825, 834 (2d Cir. 1995) ("Suffice it to say that in First Amendment cases, we must scrutinize carefully the lower

35

court's *application* of the relevant standards to the facts at hand.").

As we have explained, obstruction of the administration of justice contemplates interference with "the pendency of some sort of judicial proceeding." *United States v. Walasek*, 527 F.2d 676, 678 (3d Cir. 1975). But obstruction of the administration of justice should "not be confused with obstruction of justice. Justice may be obstructed by mere inaction, but obstruction of the administration of justice requires something more—some act that will interrupt the orderly process of the administration of justice, or thwart the judicial process." *United States v. Warlick*, 742 F.2d 113, 115–16 (4th Cir. 1984) (citing *Ex parte Hudgings*, 249 U.S. 378, 383 (1919)); *compare In re Michael*, 326 U.S. 224, 228 (1945) ("[P]erjury alone does not constitute an 'obstruction' [of the administration of justice] . . . [and] there 'must be added to the essential elements of perjury under the general law the further element of obstruction to the Court in the performance of its duty.'" (quoting *Ex parte Hudgings*, 249 U.S. at 384)), *with Clark v. United States*, 289 U.S. 1, 11 (1933) (concluding that a prospective juror who committed perjury had also obstructed the administration of justice because she had falsely testified to qualify for the jury even though she was biased and would acquit the defendant no matter what the evidence showed). And to transgress the threshold of clear and present danger, the

36

speech must "constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil." *Craig*, 331 U.S. at 376.

The Virgin Islands Supreme Court relied on two theories in concluding that Kendall's opinion was a clear and present danger to the fairness of the *Ford* case. Neither passes muster.

According to the Virgin Islands Supreme Court, Kendall's opinion was punishable because it "called the very integrity of [its mandamus] decision into question" by "blatantly accus[ing], without proof, the Justices . . . of gross dereliction of their sworn duties and of committing illegal acts." Yet Kendall's criticism of the decision to issue mandamus—even if it unfairly impugned the Justices' motives—is simply not enough. His after-the-fact critique "could not affect [the Justices'] ability to [fairly] decide" how to rule on the petition for a writ of mandamus. *Pennekamp*, 328 U.S. at 348 (holding that "criticism of judicial action already taken," even though "the cases were still pending on other points or might be revived by rehearings," was not enough to satisfy the clear-and-present-danger standard). And the Virgin Islands Supreme Court's interests in "protecting the reputation of its judges" and "maintaining [its] institutional integrity" are insufficient "to justify the subsequent [criminal] punishment of speech." *Landmark*

37

*Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 841–42 (1978).

Nor, as the Virgin Islands Supreme Court intimated, did Kendall's opinion delay or otherwise prejudice the criminal case against Ford and Paris. According to the Virgin Islands Supreme Court, Kendall's opinion delayed the *Ford* trial by prompting the defendants to petition this Court for a writ of certiorari to review the mandamus decision.

The evidence unequivocally contradicts that account. The defendants' mere filing of a petition for certiorari in this Court did not and could not have stayed their trial. *See Brewer v. Quarterman*, 474 F.3d 207, 210 (5th Cir. 2006) (en banc) (Dennis, J., dissenting from the majority's exercise of jurisdiction) (explaining that while the *granting* of a petition for certiorari stays a case in the lower court, the *filing* of a petition for certiorari does not do so). Although the government moved to continue the *Ford* trial on November 23, 2009, to await a ruling on the defendants' petition, this Court had already denied the defendants' petition several days earlier on November 17, 2009. Judge Carroll (who ultimately presided over the *Ford* trial) nevertheless continued the trial at the defendants' request because some key defense witnesses either could not be located or were off-island. Furthermore, even if there were some evidence that the defendants' petition delayed the trial, the Virgin Islands

38

Supreme Court did not identify any evidence that Kendall's opinion caused the defendants to seek review of the mandamus decision by petitioning for certiorari. The record simply contains no support for the conclusion that Kendall's opinion delayed the *Ford* trial. *Accord Scarfo*, 263 F.3d at 95 (reversing a gag order on an attorney's speech about an ongoing case because there was no "evidence that [his] statements to the press jeopardized the fairness of the trial or in any way materially impaired or prejudiced the judicial power of the court").

The People offer an additional argument about how Kendall's opinion prejudiced the *Ford* case. According to the People, Kendall "deliberately contaminated the jury pool" by "publicly argu[ing] that the People lacked sufficient evidence to convict the *Ford* defendants," directly resulting in Paris's acquittal. People's Br. at 19. This is pure conjecture, and as conjecture it is belied by the fact that Judge Carroll was ultimately able to select an impartial jury for Ford's trial. More importantly, the Virgin Islands Supreme Court did not rely on this theory in convicting Kendall. Nor can we. *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965) (holding that the Sixth Amendment's guarantee of a trial by jury requires the jury to base its verdict only on the evidence presented at trial); *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 468 (1993) (Kennedy, J., concurring) ("Unlike a legislature, whose judgments may

39

be predicated on educated guesses and need not necessarily be grounded in facts adduced in a hearing, a jury is bound to consider only the evidence presented to it in arriving at a judgment." (internal citations omitted)).

On the whole, Kendall's opinion contained "strong language, intemperate language, and, we assume, an unfair criticism. But a judge may not hold in contempt one 'who ventures to publish anything that tends to make him unpopular or belittle him.'" *Craig*, 331 U.S. at 376 (quoting *Craig v. Hecht*, 263 U.S. 255, 281 (1923) (Holmes, J., dissenting)); *see also In re Little*, 404 U.S. 553, 556 (1972) (overturning lawyers' contempt convictions where "[t]heir convictions rest[ed] on nothing whatever except allegations [they] made in motions for change of venue and disqualification of [the judge] because of [his] alleged bias," and noting that the lawyers had not "disobeyed any valid court order, talked loudly, acted boisterously, or attempted to prevent the judge or any other officer of the court from carrying on his court duties" (internal quotation marks and citations omitted)). Consequently, Kendall's controversial remarks in the *Ford* opinion were protected by the First Amendment and cannot sustain his conviction on Count 1.

III.

On Count 2, Kendall was charged and convicted of indirect criminal contempt for failing to comply with the writ of mandamus. This conviction fails, however, because it is not supported by sufficient evidence.

Like any crime, a conviction for criminal contempt requires proof beyond a reasonable doubt. *Young v. United States*, 481 U.S. 787, 798 (1987). And like any criminal prosecution, we review the sufficiency of the evidence de novo. *United States v. Flores*, 454 F.3d 149, 154 (3d Cir. 2006) (citing *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)). In doing so, we "'examine the totality of the evidence, both direct and circumstantial,' and 'interpret the evidence in the light most favorable to the government as the verdict winner.'" *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009) (quoting *United States v. Miller*, 527 F.3d 54, 60, 62 (3d Cir. 2008)). If "all the pieces of evidence, taken together, make a strong enough case to let a jury find [the defendant] guilty beyond a reasonable doubt," then we must uphold the jury's verdict. *Brodie,* 403 F.2d at 134 (quoting *United States v. Coleman,* 811 F.2d 804, 807 (3d Cir. 1987)).

Criminal contempt generally requires the existence of a valid court order that the defendant knew of and willfully disobeyed. *Doral Produce Corp. v. Paul*

41

*Steinberg Assoc., Inc.*, 347 F.3d 36, 38 (2d Cir. 2003); *see also FTC v. Lane Labs-USA, Inc.*, 624 F.3d 575, 582 (3d Cir. 2010) (discussing civil contempt). This willfulness requirement distinguishes civil contempt from criminal contempt and requires "a specific intent to consciously disregard an order of the court or where the defendant knows or should reasonably be aware" that he is disregarding the order. *Doral Produce Corp.*, 347 F.3d at 38 (citations and internal quotation marks omitted); *Waste Conversion*, 893 F.2d at 610. Because of this willfulness requirement, good-faith compliance is a defense to criminal contempt but not civil contempt: "if the defendant's alleged disobedience is consistent with a reasonable interpretation of the court's order . . . and there is no other evidence of willfulness, we would be unable to affirm the conviction." *Doral Produce Corp.*, 347 F.3d at 38–39.

The Virgin Islands Supreme Court charged Kendall with disobeying the writ of mandamus in two ways: (1) by refusing to consider a change of venue or a continuance to minimize pretrial publicity; (2) by refusing to schedule the *Ford* case for trial and recusing himself instead of proceeding to trial (in the absence of a valid plea agreement). These two grounds, however, suffer from a similar defect: the writ of mandamus did not require Kendall to take any action with respect to these issues. Consequently, there is insufficient evidence

that Kendall disobeyed any unambiguous term of the writ of mandamus.

A. Refusal to Consider Alternatives to Minimize Pretrial Publicity

As the Virgin Islands Supreme Court acknowledged, the writ of mandamus "did not itself direct Kendall to consider a postponement or change of venue." The Virgin Islands Supreme Court nonetheless determined that the writ "precluded Kendall from concluding" that the *Ford* defendants could not obtain a fair trial "without first considering a change of venue or a postponement." *Id.*

Kendall did not, however, ignore the writ's requirement that he consider ways to minimize pretrial publicity as part of any ruling on pretrial publicity *because he never ruled on this issue*. Rather, Kendall left this question open for his successor to decide. To be sure, his opinion describes his continued belief that "widespread publicity" disclosing the defendants' earlier willingness to plead guilty "virtually foreclosed the selection of [a fair and impartial] jury in [the territory's] very small population." But his opinion does so only to explain some of the concerns motivating his recusal—not as part of any ruling on whether the pretrial publicity had violated the defendants' right to a fair trial.

43

Consequently, Kendall's discussion of pretrial publicity did not violate the writ.

B.    Recusal Instead of Proceeding to Trial

Likewise, the Virgin Islands Supreme Court conceded that the writ of mandamus did not "state that Kendall was forbidden from recusing himself and was required to immediately proceed to trial." Kendall therefore cannot be held in contempt for recusing himself rather than proceeding to trial.

The Virgin Islands Supreme Court convicted him on Count 2 anyway. It concluded that Kendall was guilty because his recusal was a pretext to avoid complying with the writ, even though pretextual recusal would not violate the writ.[11] The Special Master concluded that the

---

[11] Count 2 charged Kendall with violating the writ of mandamus by recusing himself, but the Virgin Islands Supreme Court ultimately convicted him of pretextually recusing himself even though his recusal did not violate the writ. This shift in theories raises a serious question as to whether Kendall was unconstitutionally convicted of a crime with which he was not charged. *See United States v. Vosburgh*, 602 F.3d 512, 532 (3d Cir. 2010) ("Because of [the Fifth Amendment], 'a court cannot permit a defendant to be tried on charges that are not made in the indictment against him.'" (quoting *Stirone v. United States*, 361 U.S. 212, 216 (1960))); *United States v.*

evidence was at least "equally consistent with the premise that Kendall recused himself because he believed Bethel had engaged in prosecutorial misconduct and [that he] 'could not, and ethically should not, render decisions in the case.'" V.I. S. Ct. Op. at 24. The Virgin Islands Supreme Court rejected the Special Master's assessment for one reason: the timing of Kendall's recusal. According to the Virgin Islands Supreme Court, all of Kendall's reasons for recusal arose by March 9, 2009, yet Kendall "continued to issue rulings" in *People v. Ford* after that date, and waited until after the writ issued months later to recuse himself. *Id.* at 26. So the Virgin Islands Supreme Court concluded that the timing of Kendall's decision revealed the real reason for his recusal: his disagreement with the writ of mandamus. *Id.*

That theory fails on its own terms. Its premise—that all of Kendall's reasons for recusal arose before the writ was issued—is contradicted by the evidence. While Bethel made several misrepresentations to Kendall before the writ of mandamus was issued, the last straw came after the writ issued: Bethel proffered evidence in support

---

*Daraio*, 445 F.3d 253, 260 (3d Cir. 2006) ("'The key inquiry is whether the defendant was convicted of the same conduct for which he was indicted.'" (quoting *United States v. Robles-Vertiz*, 155 F.3d 725, 729 (5th Cir. 1998))). Nevertheless, we do not consider this issue because Kendall has not raised it.

45

of the plea agreement for voluntary manslaughter that tended to exculpate the defendants and confirm their self-defense theory. Even though Bethel's factual basis was insufficient to support the plea agreement for voluntary manslaughter, Bethel forged ahead toward trial on more serious charges requiring proof of intent—an element contradicted by Bethel's own previous account of the evidence. And he pressed forward despite his "serious doubt" about the evidentiary support for those more serious charges. This post-writ conduct led Kendall to conclude that Bethel was unethically trying to "win a conviction rather than seeing that justice is done" and that he was no longer able "to accord much credence to [Bethel's] further representations" in the *Ford* case. As a result, there is not "substantial evidence that, when viewed in the light most favorable to the [People], would allow a rational trier of fact" to conclude that Kendall's recusal was pretextual.[12] *United States v. Wright*, 665

---

[12] Kendall also argues that the Virgin Islands Supreme Court lacked authority to hold him in criminal contempt for pretextual recusal where his recusal did not violate any court order. Because we conclude that Kendall's conviction on Count 2 was not supported by sufficient evidence, we need not consider whether the Virgin Islands Supreme Court was "inescapably wrong" about the scope of its contempt power. *Defoe v. Phillip*, 702 F.3d 735, 744 (3d Cir. 2012) (explaining that our limited oversight over the Virgin Islands Supreme Court

46

F.3d 560, 567 (3d Cir. 2012) (internal quotation marks and citations omitted).

Because none of the Virgin Islands Supreme Court's grounds are sufficient to demonstrate Kendall's willful non-compliance with the writ of mandamus, we must vacate his conviction on Count 2.

IV.

On Count 3, the Virgin Islands Supreme Court convicted Kendall of indirect criminal contempt for misbehaving in his official transactions based on the conduct underlying Counts 1 and 2. As the Virgin Islands Supreme Court explained, "the disposition of the obstruction of administration of justice and failure to comply charges also dictates the disposition of misbehaving in official transactions charge." V.I. S. Ct. Op. at 28. Consequently, our reversal of Kendall's convictions on Counts 1 and 2 requires us to reverse his conviction on Count 3.

---

"requires us to affirm [its] decisions . . . that are based on territorial law unless those decisions are inescapably wrong"). Nevertheless, we note that, so far as we can find, no court has ever used its limited contempt authority to punish a judge's pretextual recusal absent the violation of a court order.

## V.

Lastly, Kendall argues that the Justices violated his right to due process in two ways: First, the Justices did not recuse themselves from presiding over his contempt charges. Second, the Justices, acting as the ultimate fact-finders in his case, convicted him without personally attending his trial and observing the witnesses while they testified. Because Kendall's convictions were unconstitutional and based on insufficient evidence, we need not reach his due-process arguments.

\* \* \* \* \*

We take no issue with the Virgin Islands Supreme Court's well-intentioned desire to promote respect for the judiciary. Nowhere is such respect more important than among judges, who "have a common interest, as members of the judiciary, in getting the law right," and who, "as a result, . . . are willing to listen, persuade, and be persuaded, all in an atmosphere of civility and respect." Harry T. Edwards, *The Effects of Collegiality on Judicial Decision Making*, 151 U. Pa. L. Rev. 1639, 1645 (2003). Whatever its substantive merit, Kendall's *Ford* opinion gratuitously undermined the collegial judicial atmosphere "that helps to create the conditions for principled agreement, by allowing all points of view to be aired and considered." *Id.* But as Justice Black explained:

48

The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. For it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions. And an enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect.

*Bridges*, 314 U.S. at 270–71; *see also Landmark Commc'ns, Inc.*, 435 U.S. at 839 ("[T]he law gives '[j]udges as persons, or courts as institutions . . . no greater immunity from criticism than other persons or institutions.'" (quoting *Bridges*, 314 U.S. at 289 (Frankfurter, J., dissenting))). We will reverse the judgment of the Virgin Islands Supreme Court and vacate all of Kendall's convictions.

*In re:  KENDALL*

No. 11-4471

---

ROTH, <u>Circuit Judge</u>, concurring:

I join this Court's judgment reversing the criminal contempt conviction against Judge Kendall.  I write separately, however, to express my view that the contempt conviction should be reversed on the grounds of absolute judicial immunity.[1]  It is well-established that absolute judicial immunity protects judges from civil suit for judicial actions within their jurisdiction.  *See, e.g., Mireles v. Waco*, 502 U.S. 9, 9 (1991); *Stump v. Sparkman*, 435 U.S. 349, 357-62 (1978).  I believe that, absent corruption or bribery, such protection should also reach criminal liability for judicial actions within the judge's jurisdiction.[2]

---

[1] Because I believe that the issue of judicial immunity falls within the scope of the second issue on which we granted certiorari—whether the Virgin Islands Supreme Court erred in imposing criminal contempt on the charges of failure to comply with its mandamus order—and because it is an issue of great importance, I address the issue in this concurrence.

[2] To be sure, to the extent that offenses like corruption and bribery are not judicial acts within a judge's jurisdiction, they do not fall within this proposed extension of the doctrine of judicial immunity. *See Braatelien v. United States*, 147 F.2d 888, 895 (8th Cir. 1945) (noting that a judge "may be held criminally responsible when he acts fraudulently or

"As early as 1872, the [Supreme] Court recognized that it was 'a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehensions of personal consequences to himself.'" *Stump*, 435 U.S. at 355 (quoting *Bradley v. Fisher*, 80 U.S. 335, 347 (1871)). Rooted in English common law, the doctrine of judicial immunity is aimed primarily at preserving judicial independence. *See Forrester v. White*, 484 U.S. 219, 225 (1988) (citing *Bradley*, 80 U.S. at 348) (noting that judicial immunity historically was also a device for discouraging collateral attacks and protecting the finality of judgments); *Pierson v. Ray*, 386 U.S. 547, 554 (1967) ("This immunity . . . 'is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that judges should be at liberty to exercise their functions with independence and without fear of consequences.'") (quoting Scott v. Stansfield, L.R. 3, Ex. 220, 223 (1868), quoted in *Bradley*, 80 U.S. at 349); *United States v. Chaplin*, 54 F. Supp. 926, 933 (S.D. Cal. 1944) ("The immunity which has clothed judges for a century and a half in our country found its genesis in the English common law simultaneously with the independence of the judiciary.").

---

corruptly"); *McFarland v. Nebraska*, 109 N.W.2d 397, 403 (Neb. 1961) ("[A]ny judicial officer who acts fraudulently or corruptly is responsible criminally, whether he acts under the law or without the law.") (internal quotation marks and citation omitted). I include the qualifier of "absent corruption or bribery," however, to ensure that such criminal acts by judges will not be covered by judicial immunity.

In the civil context, "[a] long line of th[e] Court's precedents acknowledge that, generally, a judge is immune from a suit for money damages." *Mireles*, 502 U.S. at 9. There are only two circumstances in which the doctrine of judicial immunity does not apply to civil suits for money damages: (1) "a judge is not immune from liability for nonjudicial actions, *i.e.*, actions not taken in the judge's judicial capacity" and (2) "a judge is not immune for action, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.* at 11.

While the application of absolute judicial immunity in civil proceedings is well-established, the Supreme Court has noted in dicta that it has not recognized absolute judicial immunity from criminal liability. *See Mireles*, 502 U.S. at 9 n.1 ("The Court, however, has recognized that a judge is not absolutely immune from criminal liability . . . ."); *O'Shea v. Littleton*, 414 U.S. 488, 503 (1974) ("[W]e have never held that the performance of the duties of judicial, legislative, or executive officers, requires or contemplates the immunization of otherwise criminal deprivation of constitutional rights. . . . On the contrary, the judicially fashioned doctrine of official immunity does not reach so far as to immunize criminal conduct proscribed by an Act of Congress. . . .") (internal quotation marks and citations omitted).[3, 4]

---

[3] To the extent that I propose that judges not be exempt from prosecution for the offenses of bribery or corruption, my position is consistent with that of the Supreme Court.

[4] In *Ex Parte Virginia*, 100 U.S. 339 (1878), the Supreme Court did deny judicial immunity to a judge indicted for excluding black citizens from jury lists in violation of the

3

Still, some federal district courts and state courts have found judges to be judicially immune from criminal charges relating to the performance of judicial duties. *See Chaplin*, 54 F. Supp. at 934-35 (sustaining a judge's plea at bar that he should be immune from indictment and prosecution for depriving a citizen of civil rights "under the color of any law" in judicial proceedings in his court); *In re Petition of Dwyer*, 406 A.2d 1355, 1360 (Pa. 1979) (finding "that the petitioners are quasi-judicial and/or quasi-prosecutorial officers . . . [and] in the absence of allegations of bad faith or corruption, the petitioners, in granting the extensions and variance, are insulated from criminal prosecution for the consequences of their actions"); *Commonwealth v. Tartar*, 239 S.W.2d 265, 266-67 (Ky. App. 1951) (holding that the circuit court properly sustained a demurrer to the indictment of a judge for misfeasance in office because "judges acting in their official capacities should be protected from harassment by either civil suits or criminal prosecutions"); *In re McNair*, 187 A. 498, 502 (Pa. 1936) (finding that magistrate judges "cannot be subjected to liability, civil or criminal, for any of their judicial acts, no matter how erroneous, so long as they act in good faith").

I believe that, absent bribery or corruption, the importance of judicial independence warrants application of the doctrine of absolute judicial immunity to criminal liability for judicial acts performed within a judge's jurisdiction. Exposing judges to criminal liability for judicial acts performed within their jurisdiction poses the same type of

---

Civil Rights Act of 1875. However, the Court did so on the grounds that the act in question was ministerial, not judicial. *Id.* at 348.

threat to judicial independence as does exposing them to civil suit for money damages. As the courts that have found judges immune from criminal prosecution have noted, fear of criminal prosecution for judicial acts, like fear of civil suits by disgruntled litigants, could affect the ability of judges to act on their own convictions in fulfilling their judicial duties. *See, e.g., Chaplin*, 54 F. Supp. at 934 ("If judges are protected against civil actions for judicial acts, the reasons are more weighty that they should be protected against criminal actions."); *Dwyer*, 406 A.2d at 1361 ("Judges made timid because of fear of criminal prosecutions for errors in their decisions make poor public servants."); *Tartar*, 239 S.W.2d at 266 ("[O]therwise judges might be unduly burdened defending charges instigated by other governmental officers or aggrieved members of the public.").

Moreover, as courts have noted with respect to judicial immunity from civil suits, there are other means of disciplining judges that do not pose such a threat to the independence of the judiciary. Judges are subject to removal. *See* U.S. Const. art. II, § 4; V.I.S.CT.R. 209.6; *Bradley*, 80 U.S. at 354 ("But for malice or corruption in their action whilst exercising their judicial functions within the general scope of their jurisdiction, judges of these courts can only be reached by public prosecution in the form of impeachment, or in such other form as may be specially prescribed."). Judges also are subject to disciplinary controls: all states now have judicial commissions to review complaints of judicial misconduct, and there are procedures within the federal courts for such review as well.[5] *See* John O. Haley, *The Civil,*

---

[5] The majority notes that "superior courts routinely used their contempt power to hold inferior judges accountable for

5

*Criminal and Disciplinary Liability of Judges*, 54 AM. J. COMP. L. 281, 288-89 (2006). The Virgin Islands also has a judicial commission, the Commission on Judicial Conduct. V.I.S.CT.R. 209.[6]

The majority asserts, however, that there is "no support in history, law, or logic" for extending judicial immunity to criminal contempt. *Ante* at 24 n.4. The majority cites to *Pulliam v. Allen*, 466 U.S. 522 (1984) for support. *Ante* at 23 n.4. However, in *Pulliam*, the Supreme Court held

---

violating their writs and orders . . . ." *Ante* at 22 n.4. However, the majority cites only to cases from the late nineteenth and early twentieth centuries and recognizes that this practice was common only until the mid-twentieth century when codes of judicial conduct and judicial disciplinary commissions were created. *Ante* at 22-23 n.4.

[6] Complaints arising out of other cases had been filed against Judge Kendall with the Commission on Judicial Conduct's predecessor, the Commission on Judicial Disabilities. The Commission on Judicial Disabilities was nullified by this Court's decision in *Kendall v. Russell*, 572 F.3d 126 (3d Cir. 2009), in which we found that the provisions of the legislature's act allowing the Commission to remove judges violated the separation of powers principle in the Revised Organic Act that served as the Constitution of the Virgin Islands. This decision was published on July 13, 2009. On December 10, 2009, the Supreme Court of the Virgin Islands adopted Supreme Court Rule 209, which created the new judicial disciplinary body, the Commission of Judicial Conduct. V.I.S.CT.R. 209; V.I.S.CT., Promulgation No. 2009-01 (Dec. 10, 2009).

only that judicial immunity "is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity" or to an award of attorney's fees under 42 U.S.C. § 1988.[7] 466 U.S. at 541-42. The Court did not directly address whether judicial immunity should bar criminal contempt proceedings against a judge. Nevertheless, Justice Powell, in dissent, voiced concern that "[t]he specter of contempt proceedings for alleged violations of injunctive orders is likely to inhibit unbiased judicial decisionmaking as much as the threat of liability for damages."[8] *Id.* at 555

---

[7] It is noteworthy that after the Supreme Court's decision in *Pulliam*, Congress passed the Federal Courts Improvement Act of 1996, which amended 42 U.S.C. § 1983 to bar injunctive relief against a judicial officer "unless a declaratory decree was violated or declaratory relief was unavailable" and 42 U.S.C. § 1988 to bar an award of costs, including attorney's fees, against a judicial officer in any action "for an act or omission taken in such officer's judicial capacity . . . , unless such action was clearly in excess of such officer's jurisdiction." Pub. L. No. 104-317, 110 Stat. 3847 (codified at 42 U.S.C. §§ 1983, 1988).

[8] The majority asserts that the *Pulliam* Court rejected Justice Powell's dissenting argument about the danger that the threat of contempt proceedings poses to judicial independence. *Ante* at 23 n.4. I believe that this is an overstatement of the Court's position: the Court noted that a judge "risks contempt for violating the writ [of mandamus]" but did not directly respond to Justice Powell's argument about the effect that the threat of contempt proceedings could have on judicial independence. *Pulliam*, 466 U.S. at 538 n.19.

(Powell, J., dissenting).  I echo Justice Powell's concern and believe that there is a strong basis in common law and logic for extending judicial immunity to criminal contempt.[9]

Here, Judge Kendall should be judicially immune from the criminal contempt charges.  In writing the July 7, 2009, Opinion recusing himself from the Ford matter, Judge Kendall was exercising his judgment as to whether he could preside over this case in an impartial and fair manner and performing a quintessential judicial function by explaining his reasoning in a judicial opinion.  Because this was a judicial act within his jurisdiction, he would be immune from civil suit arising from the same action.  Just as exposing Judge Kendall to civil liability for such an action would threaten his ability to act upon his own convictions in performing his judicial duties, charging him with criminal contempt for this action would also undermine his judicial independence.[10]

---

[9] The majority also cites to *United States v. Claiborne*, 727 F.2d 842 (9th Cir. 1984), *United States v. Hastings*, 681 F.2d 706 (11th Cir. 1982), and *United States v. Isaacs*, 493 F.2d 1124 (7th Cir. 1974).  *Ante* at 23-24 n.4.  These cases all involve the prosecution of judges for corruption or bribery, which are precisely the types of criminal acts that I believe should not be covered by judicial immunity.  In *Hastings*, the Eleventh Circuit noted "this is not a case in which a judge is prosecuted for acts in his official capacity undertaken in good faith.  In such a case, there may exist a common law immunity from criminal prosecution." 681 F.2d at 711 n.12.

[10] Arguably, if Judge Kendall had recused himself from the *Ford* trial without writing an opinion, he might have been held in criminal contempt without a First Amendment

8

For the foregoing reasons, I believe that the criminal contempt conviction here should be reversed on grounds of absolute judicial immunity.

---

defense, in which case the issue of judicial immunity could be dispositive.